IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SYLVIA G. BERRY,                           )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )      Case No.
                                           )      11-3062-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner            )
of Social Security,                        )
                                           )
                    Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sylvia Berry seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that her fibromyalgia, carpal tunnel syndrome, and asthma are not severe impairments; (2) assessing a residual functional capacity based on the opinion of a disability examiner who is not a doctor; (3) failing to find plaintiff's subjective complaints credible; and (4) failing to perform a proper analysis at step four of the sequential evaluation. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On March 29, 2007, plaintiff applied for disability benefits alleging that she had been disabled since March 1, 2007. Plaintiff's disability stems from carpal tunnel syndrome and arthritis in her lower back. Plaintiff's application was denied on August 14, 2007. On April 16, 2009, a hearing was held before an Administrative Law Judge. On June 23, 2009 the ALJ found that plaintiff was not under a "disability" as defined in the Act. On December 13, 2010,

the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

    2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

    3.    Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

    4.    Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 3 of 39

5.      Does the impairment prevent the claimant from doing any other work?

>           Yes = disabled.
>           No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horn, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income:

| | |
|---|---|
| 1991 | $17,903.34 |
| 1992 | 21,548.89 |
| 1993 | 25,497.60 |
| 1994 | 25,806.26 |
| 1995 | 16,762.91 (two employers) |
| 1996 | 16,166.27 |
| 1997 | 23,948.24 |
| 1998 | 25,484.36 |
| 1999 | 6,027.31 |
| 2000 | 13,167.20 (two employers) |
| 2001 | 6,471.66 (seven employers) |
| 2002 | 24,582.42 (two employers) |
| 2003 | 30,075.87 (three employers) |
| 2004 | 15,187.68 (three employers) |
| 2005 | 14,445.58 (four employers) |
| 2006 | 12,467.94 (four employers) |
| 2007 | 12,244.70 (two employers) |
| 2008 | 0.00 |

(Tr. at 122-126).

**Disability Report - Field Office**

In a face-to-face interview with plaintiff on March 29, 2007, J. Cody with Disability Determinations observed no difficulty with hearing, reading, breathing, understanding,

4

coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 129).

**Function Report**

On April 10, 2007, plaintiff reported that she lives with her son and two granddaughters (Tr. at 139-146). She gets her granddaughters ready for school, feeds them, drives them to school, cleans her house, does laundry, fixes dinner, and gets the grandchildren ready for bed (Tr. at 139). Her son does the heavy lifting and takes out the trash (Tr. at 139). She is able to dress her self, bathe, shave, and feed herself with braces on her wrists (Tr. at 140). She needs no reminders to take care of personal needs, grooming, or medication (Tr. at 141). She makes "complete meals with several courses" daily and it takes her an hour to prepare (Tr. at 141). She can mop floors and mow the lawn (Tr. at 141). She has to use two hands to carry a pot (Tr. at 141). She goes out of her home daily and drives herself (Tr. at 142). She is able to shop for groceries twice a week and she goes by herself (Tr. at 142, 144). She sews sock monkeys and makes beaded key chains and earrings but has to stop until her wrists stop hurting (Tr. at 143). She has no problems getting along with family, friends, neighbors, or others (Tr. at 144).

Plaintiff's symptoms affect her lifting, squatting, standing, walking, sitting, kneeling, stair climbing, memory, concentration, understanding, and using her hands (Tr. at 144). She has no problems with bending, reaching, talking, hearing, seeing, completing tasks, following instructions or getting along with others (Tr. at 144). She can pay attention "pretty good," finishes what she starts, and can follow written and spoken instructions (Tr. at 144). She gets along with authority figures and can handle changes in routine but does not handle stress well (Tr. at 145).

5

B.    *SUMMARY OF MEDICAL RECORDS*

On March 22, 2005, plaintiff consulted with a neurologist Clara Applegate, M.D. (Tr. at 392-394). She was referred by Dr. Lairson after reporting numbness and pain in her arms and hands. Plaintiff weighed 172 pounds. Plaintiff underwent a nerve conduction study of her extremities which was normal. Dr. Applegate's impression was bilateral upper extremity paresthesia[1] most likely due to forward head syndrome and compression of the nerves by the scalene muscles -- it was noted that plaintiff holds her shoulders and head slightly forward. Dr. Applegate believed plaintiff's thumb pain was most likely arthritic. She was encouraged to discuss getting on an anti-inflammatory with Dr. Lairson, and she was referred to Greg Peugh for exercises to treat forward head syndrome and to improve her posture.

On June 6, 2006, plaintiff was seen at Ozarks Medical Center reporting a sore throat and left wrist pain (Tr. at 366). Plaintiff weighed 195.2 pounds. She stated that a nerve conduction study showed carpal tunnel, although the nerve conduction study done the previous year was normal (Tr. at 366). Plaintiff was diagnosed with sinusitis and left carpal tunnel syndrome, although that diagnosis appears to be based on her report since there is no indication that any testing was done on this day. She was prescribed a left hand splint, Motrin (non-steroidal anti-inflammatory), Bactrim (antibiotic), and Nalex (antihistamine). She was told to follow up with Dr. Lairson.

Plaintiff was seen again at Ozarks Medical Center about a week later, on June 11, 2006 (Tr. at 365). She weighed 199.2 pounds. She reported suffering trauma to her right shoulder when she was holding on to an inner tube going through a current. An x-ray was taken of plaintiff's right shoulder but revealed no obvious fracture or dislocation (Tr. at 358). Plaintiff

---

[1]A skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause.

6

was diagnosed with a right shoulder contusion/strain, was prescribed 60 mg of Toradol (non-steroidal anti-inflammatory), was instructed to rest and use heat on her shoulder three to four times per day, and was told to use Motrin 800 mg every eight hours as needed for pain. Her activities were not restricted.

On July 3, 2006, plaintiff was seen at Ozarks Medical Center due to a nose bleed after having fallen the day before (Tr. at 340-346). She was diagnosed with a nasal fracture, prescribed Vicodin (a narcotic), and told to use cool packs. However an x-ray indicated no evidence of an acute fracture (Tr. at 357).

March 1, 2007, is plaintiff's alleged onset of disability. On March 29, 2007, plaintiff applied for disability benefits.

On May 1, 2007, plaintiff underwent a gallbladder ultrasound, which indicated acute cholecystitis (inflammation of the gallbladder), as well as a prominent pancreatic head and fatty infiltration of the liver (Tr. at 355). That same day a nurse diagnosed carpal tunnel syndrome after plaintiff complained of left and right wrist pain and difficulty grasping (Tr. at 632). However, an electromyogram and nerve conduction study on May 2, 2007, were normal, with no findings suggestive of carpal tunnel syndrome (Tr. at 373). This was the second nerve conduction study showing normal results.

Naomi G. Dyck, FNP, diagnosed plaintiff with hypertension (high blood pressure), arthralgias (joint pain), carpal tunnel syndrome, and depression on May 15, 2007 (Tr. at 401-402). Plaintiff had not taken hypertensive medication for about one year and wanted to resume medication. Physical examination indicated mild abdominal tenderness and muscular tenderness along the paravertebral spine, but was otherwise normal. Plaintiff had a normal gait and station; adequate muscle strength and tone; normal range of motion in her neck, back, and extremities; and no visible swelling, redness, or excessive warmth in her wrists, hands,

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 7 of 39

knees, or ankles. Ms. Dyck prescribed medication for hypertension and ulcers and recommended nonsteroidal anti-inflammatory medication for joint pain.

One week later, on May 22, 2007, plaintiff presented for a follow up visit with Ms. Dyck (Tr. at 399-400). Plaintiff had a cholecystectomy (surgical removal of the gallbladder) five days prior and reported pain in her joints. Ibuprofen provided some relief. Examination indicated noticeable swelling in the extremities, muscular tenderness along the spine, and tender trigger points. Plaintiff had full range of motion and muscle strength. Ms. Dyck assessed fibromyalgia and arthralgia. She prescribed an antidepressant for insomnia and myalgias (muscle pain).

In August 2007, plaintiff followed up with Ms. Dyck, complaining of back and wrist pain and headaches (Tr. at 538-539). Ms. Dyck noted that plaintiff became tearful when talking about her pain and other symptoms. Physical examination indicated generalized tenderness in the abdomen, muscular tenderness along the spine, and tender points consistent with fibromyalgia. Plaintiff had no swelling, redness, or excessive warmth in her extremities, good range of motion in her back and extremities, normal muscle strength, strong grip, and normal sensation. Ms. Dyck assessed fibromyalgia and depression, among other things, and prescribed an antidepressant, counseling, stretching, and Tylenol.

Plaintiff saw Eileen Warner, RN, CS-FNP, on August 13, 2007, and reported lower back and knee pain (Tr. at 484). Plaintiff weighed 184 pounds. She stated that she had asthma but was not being treated. She also stated that Ultram (narcotic-like pain reliever) was not helping her back and knee pain. Physical examination revealed high blood pressure, but plaintiff had not taken her medication. Plaintiff was wheezing; and Ms. Warner prescribed allergy medication, asthma medication, and Vicoprofen (narcotic) for back and knee pain.

8

Plaintiff followed up with Ms. Warner on September 5, 2007, reporting better breathing (Tr. at 483). She reported that the pain medication Ms. Warner had prescribed was not adequate at twice per day and stated that her depression had not improved. Ms. Warner prescribed a different antidepressant medication and increased the Vicoprofen pain medication to three times per day.

Plaintiff's attorney referred her to Behavioral Health Care where she was seen by Luann McKee, LCSW, on September 12, 2007 (Tr. at 456-459). Plaintiff reported no past psychiatric treatment or mental health services. She acknowledged a history of alcohol abuse and reported that she was convicted of driving while intoxicated in July 2007. She stated that she saw shadows "coming for her." Plaintiff reported a history of childhood sexual abuse and domestic violence, and Ms. McKee diagnosed post traumatic stress disorder ("PTSD"). A mental status examination indicated an anxious and depressed mood, congruent affect, fair attention, and impaired immediate memory based on the fact that plaintiff reported she cannot remember what she reads. Plaintiff reported living on government assistance and financial assistance from the Yakima Indian Tribe (Tr. at 458).

Plaintiff returned for psychotherapy with Ms. McKee on October 31, 2007, and presented with a depressed and anxious mood (Tr. at 454-455). She reported that the shadows she had been seeing were flies on the chandelier. Ms. McKee noted a diagnosis of PTSD. Although plaintiff reported that her back, knee, wrist, and ankle pain was currently a 9 out of 10, Ms. McKee did not record any observations of pain behavior and plaintiff spent 55 minutes in the counseling session.

On October 31, 2007, plaintiff saw Ms. Warner who assessed acute exacerbation of asthma, sinusitis, and mildly progressed depression (Tr. at 481). She prescribed antibiotics and

9

told plaintiff to increase her Citalopram.[2]  She contacted Dr. Shaw to refill plaintiff's Vicoprofen (narcotic) and Soma (muscle relaxer).

On November 13, 2007, Arifa Salam, M.D., of Behavioral Health Care, evaluated plaintiff (Tr. at 451-452).  Plaintiff reported a history of binge drinking and had a DUI in July of 2007 (about four months earlier) but denied any current use of alcohol.  "The patient tended to minimize substance abuse in her past."  She was raising two grandchildren and reported having moved to Missouri from Washington to get away from her family.  She said that she tried to work a factory job but could not due to carpal tunnel syndrome.  She had charges pending for assault.  A mental status examination indicated a depressed and anxious affect and limited judgment and insight, but was otherwise normal.

Dr. Salam diagnosed recurrent major depression, PTSD, and alcohol abuse (Tr. at 452). He recommended that plaintiff continue therapy, he took her off Zoloft (antidepressant) and started her on Effexor for depression, he took her off Elavil for insomnia and prescribed Trazodone instead, and told her to follow up in a month.

Plaintiff presented for follow up with Dr. Salam on December 19, 2007, and he diagnosed depression, PTSD, and a history of alcohol abuse (Tr. at 449).  Plaintiff was tolerating her medications well and showed improvement in sleep, depression, and functioning, with less irritability.  Dr. Salam noted that plaintiff appeared "a little anxious," but examination findings were otherwise normal.

On December 20, 2007, plaintiff sought treatment with Donna Milligan, PA-C, of Southern Missouri Ear, Nose & Throat (Tr. at 564-567).  Plaintiff complained of allergies, sinus problems, ear infections, headaches, and vertigo.  She weighed 187 pounds.  She reported

---

[2]An antidepressant drug of the selective serotonin reuptake inhibitor ("SSRI") class.

10

smoking but had not had a drink since July 2007. Ms. Milligan assessed sinusitis, dizziness, dysphagia (difficulty swallowing), hearing loss, gastroesophageal reflux disease, and hoarseness. She encouraged plaintiff to pick up her refill of Prilosec (reduces stomach acid) and to continue alcohol abstinence. She also counseled plaintiff to stop smoking.

The next day, on December 21, 2007, plaintiff saw Ms. Warner for refills of pain medication and muscle relaxers (Tr. at 476). Plaintiff rated her pain a 6 out of 10 without medication and 3 or 4 while on her medication. Ms. Warner noted muscle spasms and diffuse tenderness in plaintiff's back. She assessed hypertension (plaintiff's blood pressure was not noted in this medical record) and chronic back pain. Ms. Warner contacted Dr. Shaw for refills of Soma and Vicoprofen.

On January 9, 2008, plaintiff presented for therapy with Ms. McKee and reported that her mood was stable with the antidepressant (Tr. at 447-448). Plaintiff was less depressed and anxious. She reported good control of her moods on Effexor. "When she missed two days doses she became irritable and that was resolved when she got back on her medication." She was able to clean without feeling an obsessive need to clean, but did report the need to stay busy constantly. Plaintiff reported currently experiencing pain in her wrists and ankles of 10 out of 10; however, Ms. McKee did not note any observations of plaintiff's severe pain.

On January 18, 2008, plaintiff saw Ms. Warner for a well-woman exam (Tr. at 474). Plaintiff stated that her pain was well controlled. She got refills of Vicoprofen and Soma after Ms. McKee contacted Dr. Clarkston.

Plaintiff presented for follow up with Dr. Salam on February 13, 2008 (Tr. at 445). Her father had died recently and she was "a little depressed." Plaintiff's sleep was adequate and she denied suicidal thoughts or alcohol use. Dr. Salam increased plaintiff's antidepressant medication and reduced her insomnia medication.

At an appointment with Ms. Warner one week later, on February 20, 2008, plaintiff reported trouble sleeping but was otherwise doing well on medication (Tr. at 473). She said her pain was a 7 or 8 without medication and a 3 or 4 with medication. "She is unable to perform activities of daily living." There was no elaboration on that statement which seems contradictory since Ms. Warner had written that aside from some sleeping difficulties, "she's doing fairly well." Plaintiff's exam was normal except for muscle spasms in her back and neck. Ms. Warner contacted Dr. Shaw who refilled plaintiff's Vicoprofen and told her to increase her Soma (muscle relaxer) to aid with sleep disturbance.

Plaintiff saw Kendell C. Clarkston, M.D., on March 4, 2008, complaining of right knee pain and back pain that was not improving (Tr. at 540). Plaintiff reported a history of hypertension, arthritis of the wrists and ankles, lower back pain, depression, and carpal tunnel syndrome. Plaintiff's lungs were clear without wheezing. She had normal gait and station, adequate muscle strength, normal range of motion, and a stable right knee. Dr. Clarkston diagnosed back pain and minor knee pain and recommended exercises, stretching, and other conservative therapy in addition to plaintiff's current pain medication. Dr. Clarkston administered an injection of non-steroidal anti-inflammatory and referred plaintiff to a pain specialist.

X-rays of plaintiff's spine on March 20, 2008, revealed mild degenerative changes of the lumbar spine (Tr. at 637).

On March 24, 2008, plaintiff saw Ms. Warner and reported back and leg pain and a recent fall (Tr. at 470). She reported pain at a 3 out of 10 with medication. A physical examination was normal but for muscle spasms in the lumbar region. Ms. Warner assessed back pain and hypertension, administered an NSAID injection, and refilled plaintiff's medications.

An MRI on March 25, 2008, revealed mild disc bulges at L4-5 and L5-S1, but no acute bone abnormality or focal disc herniation (Tr. at 512).

Plaintiff saw Dr. Salam on March 26, 2008, for follow up on depression and reported improvement with medication and adequate sleep (Tr. at 443). Dr. Salam diagnosed major depression, PTSD, bereavement, and alcohol abuse in remission. He continued her on her same medications and told her to follow up in six to eight weeks.

The next day, March 27, 2008, plaintiff presented for psychotherapy with Ms. McKee (Tr. at 441-442). Plaintiff was less depressed and anxious, but reported recently drinking an excess of alcohol and taking extra antidepressants while visiting her family in Washington.

Richard Tompson, M.D., a pain specialist, evaluated plaintiff's lower back on April 8, 2008 (Tr. at 512-514). Plaintiff denied radiation of her pain. She reported having had "great benefits" from physical therapy and massage in the past and said that her ability to perform activities of daily living were greatly improved with medication. Dr. Tompson observed that plaintiff was in no apparent distress, was pleasant and interacted appropriately, was calm, well groomed, alert and conversant. Dr. Tompson assessed lumbar disc displacement, lumbosacral spondylosis (degeneration of the spine), sacroiliitis,[3] and back pain. He recommended epidural spinal injections, a possible lumbar medial branch block and radiofrequency ablation, and possible steroid or local anesthetic injection. He also recommended changing plaintiff's pain medication from Vicoprofen to Norco (another narcotic).

Plaintiff presented to Dr. Clarkston on April 15, 2008, reporting that she was not taking pain medication, was doing okay overall, and her asthma was under "fair control" (Tr. at

_____

[3]An inflammation of one or both of the sacroiliac joints, which connect the lower spine and pelvis.

13

543).  Physical examination was normal.  Dr. Clarkston noted that plaintiff's depression was improved.

On April 17, 2008, Dr. Tompson administered the epidural spinal injection (Tr. at 511).  Plaintiff reported good benefit from the injection on April 29, 2008, with a 50 percent decrease in pain and said she required less pain medication (Tr. at 508-510).  Dr. Tompson administered a medial branch block at L4-5 on April 30, 2008 (Tr. at 505-506).  On May 1, 2008, plaintiff reported great benefit with an 80 percent decrease in pain and slight improvement in range of motion (Tr. at 502).  Dr. Tompson performed a radiofrequency ablation on May 7, 2008, and plaintiff reported a 75 percent decrease in pain on May 20, 2008 (Tr. at 495, 499).

Plaintiff saw Dr. Salam for a follow up on May 21, 2008, reporting improved depression and sleep, but excessive anxiety (Tr. at 439).  Dr. Salam noted that plaintiff appeared quite anxious and nervous.  He diagnosed major depression, PTSD, alcohol abuse in remission, and wanted to rule out generalized anxiety disorder.  He prescribed an increased dosage of antidepressant and insomnia medication.

Dr. Tompson performed an arthrography[4] on June 4, 2008, which indicated sacroiliitis (Tr. at 492).  He also performed an intra-articular sacroiliac joint injection.  Plaintiff reported that her pain was doing fairly well on June 9, 2008 (Tr. at 469).  On June 17, 2008, plaintiff followed up with Dr. Tompson and reported an absence of pain after the injection with 80 percent improvement on the right and 10 percent improvement on the left after three days (Tr. at 490).  On June 18, 2008, Dr. Tompson performed a radiofrequency ablation for sacroiliitis

---

[4]Arthrography is a procedure involving multiple x-rays of a joint using a fluoroscope, or a special piece of x-ray equipment which shows an immediate x-ray image. A contrast medium (in this case, a contrast iodine solution) injected into the joint area helps highlight structures of the joint.

14

(Tr. at 487-488).

Plaintiff met with Ms. McKee for therapy on June 23, 2008 (Tr. at 437). Ms. McKee noted that plaintiff's mood was less depressed and anxious.

On July 8, 2008, plaintiff reported no benefit with radiofrequency ablation (Tr. at 486). She presented for follow up with Dr. Clarkston the same day (Tr. at 545). She said she stopped taking her high blood pressure medication three months earlier because her blood pressure readings had been normal. Her blood pressure on this day was 142/100. Plaintiff weighed 187.6 pounds and her physical exam was normal. Dr. Clarkson refused to refill plaintiff's pain medications and muscle relaxers but gave her a prescription for high blood pressure medication.

Patricia Carson, APRN, BC, of Behavioral Health Care evaluated plaintiff on July 23, 2008 (Tr. at 435). Plaintiff reported anxiety and chest pain. "She recently, this weekend, got very drunk and had a fight with her sister-in-law and is sporting all sorts of bruises today as a result of that." Ms. Carson noted that plaintiff was positive for tangential and pressured speech and reported difficulty sleeping, but the mental status examination was otherwise normal. Ms. Carson assessed recent alcohol intoxication and a history of alcohol poisoning, and prescribed BuSpar (treats anxiety), Hydroxyzine for anxiety and hives, Campral,[5] Trazodone (an antidepressant used to treat insomnia), and Effexor XR (treats depression).

---

[5]Brand name of Acamprosate. Acamprosate is used along with counseling and social support to help people who have stopped drinking large amounts of alcohol (alcoholism) to avoid drinking alcohol again. Drinking alcohol for a long time changes the way the brain works. Acamprosate works by helping the brains of people who have drunk large amounts of alcohol to work normally again. Acamprosate does not prevent the withdrawal symptoms that people may experience when they stop drinking alcohol. Acamprosate has not been shown to work in people who have not stopped drinking alcohol or in people who drink large amounts of alcohol and also overuse or abuse other substances such as street drugs or prescription medications. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000272/

Plaintiff saw Ms. McKee for psychotherapy on July 24, 2008, and they discussed plaintiff's alcohol relapse (Tr. at 433-434). Plaintiff's mood was less depressed and anxious. She reported "compulsive cleaning," and pain at a three out of ten.

On August 14, 2008, plaintiff had a panic attack while in Washington and was taken by ambulance to a hospital where a physician noted she was delusional, disoriented, and hallucinating (Tr. at 519-521). She complained of stress due to having to return to Missouri that evening. Plaintiff weighed 187 pounds and tested positive for THC (marijuana). The physician diagnosed psychosis and discharged her to her sister (Tr. at 523, 530).

On August 26, 2008, Dr. Clarkston noted no abnormal findings on physical examination (Tr. at 548). He assessed hypertension, back pain, depression, and a minor cough, and prescribed medications for anxiety and depression.

Plaintiff saw Ms. Carson on October 2, 2008 (Tr. at 429). Plaintiff had recently taken a trip to New Mexico and visited her childhood home which she said caused what Ms. Carson believed was a panic attack with dissociative aspects. "She also had a relapse during this time." Plaintiff had not been taking her Campral (see footnote 5) and was not going to Alcoholic Anonymous meetings. Ms. Carson encouraged plaintiff to use Campral but did not rewrite the prescription. She referred plaintiff to Alcoholics Anonymous. She prescribed Abilify (anti-psychotic) and increased Cymbalta (treats depression and anxiety).

Ms. McKee completed a mental medical source statement form on October 30, 2008, (Tr. at 461-462). She found that plaintiff is not significantly limited in the following:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions
- The ability to carry out very short and simple instructions
- The ability to ask simple questions or request assistance

16

She found that plaintiff is moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was markedly limited in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

Janice L. May, Psy.D., performed a consultative psychological assessment of plaintiff on

October 31, 2008, at the request of plaintiff's counsel (Tr. at 463-467). Plaintiff reported that

17

she lived with her son and two granddaughters. "She stated she is very protective of her grand-daughters and does not trust anyone to watch over them. She even mentioned being hesitant to put them in public schools." Plaintiff's hobbies included sewing and bead work.

Plaintiff dropped out of school at the beginning of 9th grade due to pregnancy. She earned a GED and received a diploma in Accounting and Bookkeeping after one year of college. She last worked full time in 2004 at Wal-Mart. She worked part time cleaning houses until July 2008. Plaintiff reported drinking until age 39 when she quit due to not having enough money. She enrolled at that time in an alcohol treatment program and said she had not had a beer since August 2008 (about two months earlier). Plaintiff's drivers license was suspended due to a DUI conviction in July 2007 and she had not yet completed the SATOP training which was required to get her license back.

Plaintiff was oriented to person, place and time; memory was intact; she had no difficulty engaging in abstract thinking; judgment was intact; intelligence was average; insight into psychological functional was fair; attention/concentration was limited as plaintiff often shifted topics; she was able to process information in a logical and coherent manner. Dr. May offered the following opinion:

> Mrs. Berry appears to be experiencing symptoms consistent with Alcohol Abuse, early remission and Bipolar disorder, most recent episode depressed. In my opinion, at this time, Mrs. Berry has a mental disability which may limit her ability to engage in employment or gainful activity for which her age, training, experience or education will fit her at this time. Given Mrs. Berry's current depressive symptoms, she is likely to have difficulty with concentrating, carrying out or remembering simple instructions, staying focused on task or completing tasks. Mrs. Berry appears to experience difficulty regulating her emotions. Her initial response to any given situation where she "wants something" but "can not get it is to become angry. . . . Depending upon Mrs. Berry's internal motivation and willingness/ability to seek treatment, the expected duration of incapacity is estimated to be 12 months or more. If Mrs. Berry continues medication adherence, discontinues substance use and actively engages in individual therapy, her depressive symptoms are likely to diminish in intensity. . . .

18

Plaintiff met with Ms. Carson on November 3, 2008, reporting hallucinations and numerous physical problems that did not respond to medications (Tr. at 696). Ms. Carson noted that, "She is also seeking Disability, and there is a strong secondary gain flavor to today's presentation." She assessed, "Difficulty with improvements while seeking Disability," and prescribed an increased dosage of Cymbalta and Abilify.

A pulmonary function test on November 11, 2008, was normal (Tr. at 594-597). Plaintiff weighed 183.9 pounds and reported smoking a half a pack of cigarettes.

On November 14, 2008, plaintiff saw James L. Hargis, M.D., for a pulmonary consultation and to establish care (Tr. at 552-562). She reported asthma that improved with medication and a recent increase in coughing that was worse with exertion and exposure to smoke or irritants (Tr. at 558). On exam, Dr. Hargis noted that plaintiff's lungs were "totally clear," and testing showed no abnormalities (Tr. at 559). Plaintiff had no tenderness in her back and her chest x-rays were normal. He assessed a history of asthma with "totally normal pulmonary functions today," chest wall pain consistent with costochondritis,[6] and chronic cough secondary to asthma.

Plaintiff saw LuAnn McKee for a psychotherapy session on December 11, 2008 (Tr. at 692). Her mood was depressed and anxious; and plaintiff reported crying, episodes of rage, and being stressed about finances. Plaintiff's daughter (the mother of her two granddaughters) kept saying she was coming but then changing her mind which was upsetting plaintiff and the two granddaughters. They worked on coping skills, and Ms. McKee recommended plaintiff return in three to four weeks.

---

[6]Costochondritis is an inflammation of the cartilage that connects a rib to the breastbone (sternum). It causes sharp pain in the costosternal joint -- where the ribs and breastbone are joined by rubbery cartilage. Pain caused by costochondritis may mimic that of a heart attack or other heart conditions.

19

On December 19, 2008, plaintiff saw Ms. Carson and reported anger, irritability and nightmares (Tr. at 691). She also reported fatigue and snoring, so Ms. Carson assessed probable sleep apnea and referred plaintiff for a sleep study.

Plaintiff saw Ms. McKee on January 12, 2009, for therapy and again described anger problems and being stressed about finances (Tr. at 689). Plaintiff reported having one fit of rage in the past three weeks triggered by anxiety over her son's arrest. Plaintiff reported cleaning frenzies. They worked on coping skills and plaintiff was told to return in three to four weeks.

On February 13, 2009, plaintiff was late to an appointment with Ms. Carson who noted that plaintiff smelled of alcohol at 11:30 a.m. (Tr. at 688). Plaintiff denied using alcohol, was noted to contradict herself a great deal, and "does not take any of her medication with any reliability." Plaintiff "pushes hard for a benzodiazepine [tranquilizer]." Ms. Carson assessed addictive issues and discontinued antidepressant medication.

On February 25, 2009, plaintiff met with Ms. McKee, reporting panic attacks and a relapse with alcohol on February 7 (which was almost a week before she showed up for an appointment with Ms. Carson smelling of alcohol) (Tr. at 743). Plaintiff stated that she had attacked people since being taken off her antidepressant medication. She was angry with Ms. Carson for abruptly discontinuing her antidepressant medication.

On March 11, 2009, plaintiff followed up with Ms. Carson, who diagnosed PTSD and noted that plaintiff was stable, doing better, and not craving alcohol (Tr. at 745). Although she complained of having gained weight (her weight was not listed), a mental status examination was normal. Ms. Carson prescribed an antidepressant and other medications.

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 20 of 39

Dr. May completed a mental medical source statement form on March 11, 2009, based on her evaluation of plaintiff in October 2008 (Tr. at 740-741). Dr. May found that plaintiff was not significantly limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Dr. May found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

21

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

Dr. May found that plaintiff was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors.

## C.    SUMMARY OF TESTIMONY

During the April 16, 2009, hearing, plaintiff testified; and George Horn, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 40 years of age (Tr. at 49). She is a high school graduate (Tr. at 49). She is 5'1" and weighs about 210 pounds (Tr. at 56). Plaintiff testified that she gained 60 pounds in the preceding three months (Tr. at 57). Plaintiff has a son, who was 22 at the time of the hearing and is disabled (Tr. at 116). Her two grandchildren receive AFDC (Tr. at 116).[7]

Plaintiff is unable to work due to her wrists, her back, standing, and being out in the public with people (Tr. at 49). Plaintiff has post traumatic stress disorder and depression (Tr. at 49). Plaintiff cries a lot every day "when people are questioning [her]." (Tr. at 50). This has been going on for many years because plaintiff was sexually abused when she was five (Tr. at 50). She has problems with anger (Tr. at 50). She suffers from grieving because her parents passed away (Tr. at 50). She has mood swings (Tr. at 51). When she is on her medication, she has no problems getting along with people (Tr. at 51). She has experiencing problems focusing as she has aged (Tr. at 51). She had an anxiety attack in August 2008 (approximately

---

[7]In addition, plaintiff stated in her financial affidavit filed with her motion to proceed in forma pauperis that she receives a total of $872 per month in welfare, food stamps, and other government benefits for her grandchildren.

22

eight months earlier) and also "the other day" before getting staples removed from her stomach (Tr. at 52). Plaintiff hears voices; she hears telephones ringing (Tr. at 52).

Plaintiff was diagnosed with arthritis in her back in 1992 (Tr. at 53). The pain radiates into both legs, and she describes it as a ten out of ten in severity (Tr. at 53). Pain medication can reduce her pain to a zero (Tr. at 53). Plaintiff has to lie down for pain relief 20 to 30 minutes out of every hour (Tr. at 54).

Plaintiff has carpal tunnel syndrome (Tr. at 54). She was unable to pass a typing test because she had to get to 40 words per minute and could not do it because of the wrist pain (Tr. at 54-55). Plaintiff cannot use her hands -- she experiences the wrist pain as soon as she gets up in the morning (Tr. at 55). Her hands swell until she takes blood pressure medication which she needs because her blood pressure soars due to her pain (Tr. at 55).

Plaintiff experiences weakness and fatigue which prevents her from writing neatly (Tr. at 55).

Plaintiff has problems with her ankles which cause her to fall constantly (Tr. at 55).

Plaintiff has sleep apnea and sleeps with a C-PAP machine (Tr. at 56). She still has problems sleeping with the machine because she cannot keep it on her face (Tr. at 56). She is drowsy during the day (Tr. at 56). She gets about four hours of sleep at night (Tr. at 56). Plaintiff has bad dreams every day about her past history of sexual abuse, but she tries not to think about it (Tr. at 56).

Plaintiff suffers from migraine headaches for which she takes Topamax (Tr. at 57). When asked if her migraines continue even with the medication, she said, "Only if I forget to take the medication." (Tr. at 57).

Plaintiff experiences drowsiness from her medication (Tr. at 57). "I don't drive because one day I was driving and I -- a piece of mail fell down and I picked it up and I forgot I was

23

driving and I let go of the wheel. And thank God I was only on my side of the -- on the country road and I only went off the road by myself." (Tr. at 57-58). Plaintiff is slower now than she used to be (Tr. at 58). When she worked she was 100% - now she is about 10% (Tr. at 58). Plaintiff has about three good days per week (Tr. at 58).

Plaintiff previously worked as a custodian, a secretary, a filler (of pillows), as an assembler, as a retail sales person, and in foster home care (Tr. at 59). Plaintiff testified that she can stand for about five hours (Tr. at 59). She could sit for about three hours but would need to take a break to lie down (Tr. at 60). She can lift nothing (Tr. at 60).

Plaintiff does the dishes, she does a little bit of cooking, she does no laundry and no cleaning (Tr. at 60). She gets up in the morning, makes coffee, wakes up her granddaughters, feeds them cereal, gets them to the bus stop, has coffee, takes her time cleaning up as much as she can, watches television, visits people (Tr. at 61). She does not go to movies or restaurants because she does not have the money (Tr. at 61). She goes to stores and church but someone else drives her (Tr. at 61).

Plaintiff testified that she does not drink or use drugs (Tr. at 62). "I never done illegal drugs sir. I've drank alcohol. The last time was in December of '08." (Tr. at 62). She goes to AA meetings at least three times a week (Tr. at 62).

The ALJ questioned why plaintiff failed to report such frequent outings:

Q.      Didn't I ask you if you go outside your house to do things?

A.      Yes.

Q.      Well, don't you have to go outside the house and go to AA meetings?

A.      Yes.

Q.      Alright. Well, you kind of left that out.

A.      Oh, I'm sorry.

24

Q. And how often will you go to AA meetings?

A. At least three times a week.

Q. Well, that's quite a bit, isn't it?

A. Yes.

Q. Well, why did you leave that out?

A. I don't know.

Q. I mean, isn't that kind of important?

A. Yes, sir.

(Tr. at 62-63).

## 2. Vocational expert testimony.

Vocational expert George Horn testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes secretary (DOT 201.362-030), data entry clerk (DOT 203.582-054), case aide (DOT 195.367-010), child welfare case worker (DOT 195.107-014), commercial cleaner (DOT 381.687-014), sales attendant (DOT 299.677-010), filler (DOT 780.684-066), electric motor assembler (DOT 721.684-022), and motor vehicle dispatcher (Tr. at 64-65).

The first hypothetical involved a person who could stand or walk six hours per day, sit six hours per day, is mild to moderately limited in understanding and remembering tasks for sustained concentration and mild to moderately limited in interacting with the general public, adapting to workplace changes, and using an aggressive mental limitation skill (Tr. at 65). The hypothetical person could perform plaintiff's past relevant work as a sales attendant, filler, and electric motor assembler (Tr. at 66). If the person were markedly limited in the mental functions, she could not perform those jobs (Tr. at 66).

With the ability to perform medium exertion work and with the mild to moderate mental limitations in the above hypothetical, the person could be a kitchen helper with 1,000 in Missouri and 40,000 in the country, or an automobile detailer, with 1,000 in Missouri and 40,000 in the country (Tr. at 66-67).

With the ability to perform only light exertion work and with the mild to moderate mental limitations in the first hypothetical, the person could be a small products assembler, with 1,000 in Missouri and 40,000 in the country, or an office helper, with 1,000 in Missouri and 40,000 in the country (Tr. at 67).

A person with the limitations in the medical source statement completed by Janice May, Psy.D., on March 11, 2009, could not work (Tr. at 69).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Edward Graham entered his opinion on June 23, 2009 (Tr. at 21-29).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 23).

Step two.  Plaintiff suffers from degenerative disc disease of the lumbar spine, depression and anxiety, which are severe impairments (Tr. at 23).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 23).

Step four.  Plaintiff's subjective complaints are not credible as they are out of proportion to the objective findings (Tr. at 28).  Plaintiff retains the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; stand or walk for six hours per day; sit for six hours per day; and has mild to moderate limitations in understanding and remembering tasks, sustaining concentration and persistence, socially interacting with the general public and adapting to workplace changes (Tr. at 24).  With this residual functional

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 26 of 39

capacity, plaintiff can return to her past relevant work as a sales attendant, filler and motor assembly (Tr. at 29).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 27 of 39

<u>Polaski</u> opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant told her therapist on October 30, 2008 that she has not had a drink in "several weeks". The claimant admitted on November 25, 2008 that she typically consumes beer and hard liquor. However, she claimed that her last drink was on July 1, 2007. The claimant told Patricia Carson on November 3, 2008 that she is seeing shadows and at first the Abilify seemed to help, but that it does not any longer. Patricia Carson noted that the claimant is also seeking disability, "and there is a strong secondary gain flavor to today's presentation." . . . The claimant stated on November 26, 2008 that she had a beer. . . . The claimant said on December 19, 2008 that she has not been drinking. . . . Patricia Carson noted during the claimant's follow up on February 13, 2009 that the claimant smelled of alcohol, which the claimant currently denied. Patricia Carson also noted on the mental status examination that the claimant contradicts herself a great deal. Patricia Carson stated that the claimant does not take any of her medication with any reliability. Her assessment was, "continues with addictive issues."

> * * * * *

> The claimant's subjective complaints and alleged limitations are not consistent with the treatment she receives. The treatment records show that the claimant was not fully compliant with taking psychiatric medications. She has history of alcohol abuse and had periods of relapses after the alleged onset date. The claimant also smokes cigars despite her history of asthma. The claimant has not received surgery for her alleged carpal tunnel syndrome or chronic back pain. It is reasonable to assume that if the claimant were experiencing the disabling problems alleged, she would have received more aggressive treatment and she would have been fully compliant with treatment.

> Even one of the claimant's own providers has questioned the credibility of the claimant's subjective complaints. Patricia Carson noted on November 3, 2008 that the claimant is also seeking disability, "and there is strong secondary gain flavor to today's presentation." Ms. Carson stated on February 13, 2009 that the claimant smelled of alcohol, which the claimant currently denied, and the claimant contradicted herself a great deal on the mental status examination.

28

(Tr. at 27-29).

1.    *PRIOR WORK RECORD*

Plaintiff's earnings record shows average earnings; however, in the seven years before her alleged onset date, plaintiff's income came from two to seven employers in any given year. After she moved to Missouri, she lived off of government assistance; and she told a doctor that she is so protective of her granddaughters that she did not trust anyone else to watch over them. This suggests a motivation to remain on government benefits and to seek disability benefits for reasons other than true disability. The Eighth Circuit has held that an ALJ may discount a claimant's subjective complaints when she appears to be motivated to qualify for disability benefits. See Eichelberger v. Barnhart, 390 F.3d at 590 ("[T]he ALJ found that Eichelberger had objectively determinable impairments, but also noted that her incentive to work might be inhibited by her long-term disability check of $1,700 per month") (citing Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996)).

2.    *DAILY ACTIVITIES*

The record contains multiple references to plaintiff's obsessive cleaning, which is clearly contradictory to her allegations of complete physical disability. She also got into several physical fights, also casting doubt on her allegations that she is physically unable to do any job. Plaintiff cares for her two young granddaughters; she feeds them, gets them ready for school, drives them to school. She cleans house, does laundry, cooks several-course meals daily, mops floors, mows the lawn, and takes care of her own personal needs. She is able to go out of her home daily and drives herself, she can shop for groceries alone, and she can sew sock monkeys and make beaded jewelry. She can pay attention, she finishes what she starts, and can follow both written and spoken instructions. These self-reported daily activities are entirely inconsistent with complete disability. The medical records indicate that plaintiff was able to

29

travel to Washington multiple times and New Mexico.  Finally, the ALJ noted during the hearing that plaintiff was not being honest about her answers and contradicted herself during her testimony.

### 3.  DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff reported her pain a "9 out of 10" or a "10 out of 10" on multiple occasions; however, she was able to sit through an hour-long medical appointment without the medical provider making any note of pain observations.  Plaintiff reported that her pain was a 3 or a 4 while on her medication, yet she consistently failed to take her medication as directed.  She reported good control of her moods on her antidepressant medication yet failed to take that medication regularly as directed despite the increase in symptoms when she missed doses.

### 4.  PRECIPITATING AND AGGRAVATING FACTORS

The most common precipitating and aggravating factor in this record is plaintiff's refusal to take her medication as directed.  In addition, her abuse of alcohol significantly increased her mental symptoms.

### 5.  DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The record consistently establishes that when plaintiff took her medication as directed and abstained from alcohol use, her symptoms (both physical and mental) were well controlled.

Plaintiff argues that the ALJ discussed neither the side effects nor plaintiff's work history adequately in his opinion.  However, the ALJ is not required to discuss methodically each Polaski consideration, so long as he "acknowledged and considered those factors before discounting [the claimant's] subjective complaints."  See Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (citing Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)); Tucker v. Barnhart, 33 F.3d 781, 783 (8th Cir. 2004)).  The ALJ articulated the inconsistencies upon

30

which he relied in discrediting plaintiff's allegations regarding the extent of her limitations. This finding is supported by substantial evidence in the record as a whole, and I find that any alleged side effects or the positive aspect of plaintiff's work history do not undermine the ALJ's finding.

6.  *FUNCTIONAL RESTRICTIONS*

No treating source ever restricted plaintiff's activities.

B.  *CREDIBILITY CONCLUSION*

In addition to the above factors, the ALJ properly considered inconsistencies between plaintiff's subjective allegations and the objective medical evidence. See 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); SSR 96-7p. The ALJ found that the medical evidence did not support all of the physical symptoms and limitations alleged by plaintiff. Plaintiff complained of pain, swelling, and functional limitations in her hands due to carpal tunnel syndrome, yet an EMG and nerve conduction studies were normal. Examinations indicated no swelling and normal range of motion in plaintiff's wrists. Plaintiff complained of severe back pain, but had normal strength, gait, and range of motion in her back. An MRI and x-rays showed only mild disc bulges and mild degenerative changes. A pulmonary function study in November 2008 was normal, there is no evidence of asthma attacks, and plaintiff's lungs were clear on examination in November 2008. In addition plaintiff continued smoking against medical advice.

The ALJ likewise found that plaintiff's alleged mental symptoms and limitations were not supported by the medical evidence. Plaintiff claimed to suffer depression, anxiety, mood swings, and difficulty getting along with others, but she was stable once she began taking medication. Ms. Dyck, her primary care provider, diagnosed depression and prescribed an antidepressant in August of 2007, and plaintiff's attorney referred her to Behavior Health Care

31

the following month. Dr. Salam adjusted her medications in November 2007 and she was improved by December 2007. Plaintiff appeared "a little anxious," but mental status examination findings were otherwise normal at this appointment. Treatment notes from January, February, March, and April 2008 indicate that plaintiff was stable, less depressed and anxious, and doing well on medication. Plaintiff reported excessive anxiety in May 2008, but her depression and sleep were improved. Plaintiff was notably less depressed and anxious in June and July 2008. Although plaintiff had a panic attack with psychotic features in August 2008, she restabilized quickly and had no reoccurrences. Plaintiff was stable and a mental status examination was normal in March 2009.

The Commissioner's regulations state that although an ALJ may not reject a claimant's subjective complaints based solely on the objective medical evidence, such evidence is a useful indicator in reaching conclusions about the effect of symptoms, such as pain, on the claimant's ability to work. See 20 C.F.R. §§ 404.1529(c) and 416.929(c). Moreover, Eighth Circuit case law holds that the absence of an objective medical basis to support the degree of a claimant's subjective complaints is an important factor in evaluating the credibility of her testimony and complaints. See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991). The ALJ cited plaintiff's course of treatment in his credibility finding. The conservative medical treatment received by plaintiff was inconsistent with her subjective complaints. Her providers recommended conservative treatment, including exercises, stretching, and over the counter medications. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (upholding ALJ's credibility finding when he relied on plaintiff's limited treatment).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subject complaints of disabling symptoms are not credible.

## VII. SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ erred in finding that her fibromyalgia, carpal tunnel syndrome, and asthma are not severe impairments.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)     Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--
>
> (1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2)     Capacities for seeing, hearing, and speaking;
>
> (3)     Understanding, carrying out, and remembering simple instructions;
>
> (4)     Use of judgment;
>
> (5)     Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6)     Dealing with changes in a routine work setting.

It is plaintiff's burden to produce medical evidence to support her claimed disability. 20 C.F.R. §§ 404.1512(c) and 416.912(c). Here, there is no medical evidence that asthma, carpal

33

tunnel syndrome, or fibromyalgia significantly limited plaintiff's ability to perform basic work activities. Although plaintiff took asthma medications, she was never hospitalized for an acute asthma attack, rarely demonstrated any symptoms of asthma upon examination, and a pulmonary function test in November 2008 was normal. A pulmonologist noted plaintiff's "history" of asthma, but found her lungs to be "totally clear." An EMG and nerve conduction study of plaintiff's upper extremities in May 2007 did not indicate carpal tunnel syndrome, and treatment notes do not show clinical signs of carpal tunnel syndrome. Ms. Dyck diagnosed fibromyalgia in May 2007 based on "tender trigger points," but she did not refer plaintiff to a rheumatologist, and plaintiff had no further treatment for fibromyalgia. Examinations consistently demonstrated normal range of motion and muscle strength.

Plaintiff failed to show that her fibromyalgia, asthma, and carpal tunnel syndrome significantly limit her ability to perform basic work activities. The ALJ properly determined that these conditions do not amount to severe impairments.

## VIII. RESIDUAL FUNCTION CAPACITY

Plaintiff argues that the ALJ erred in assessing a residual functional capacity based on the opinion of a disability examiner who is not a doctor and failing to perform a proper analysis at step four of the sequential evaluation.

The residual functional capacity is the most a claimant can do despite the combined effect of all credible limitations. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1). The claimant has the burden of proving the RFC at step four of the sequential evaluation. 20 C.F.R. §§ 404.1545(a)(3), 404.1512(c), 416.945(a)(3), and 416.912(c); Harris v. Barnhart, 356 F.3d 926, 929-30 (8th Cir. 2004); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). After analyzing plaintiff's credibility and considering the entire record, the ALJ properly determined plaintiff's RFC in accordance with her impairments and credible symptoms.

34

20 C.F.R. §§ 404.1545 and 416.945; SSRs 96-7p, 96-8p. As required by agency regulations and SSRs, the ALJ properly "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the medical opinion evidence. Id. The ALJ determined that plaintiff had the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and sit six hours in an eight-hour workday; had mild to moderate limitations in understanding and remembering tasks, sustaining concentration and persistence, socially interacting with the general public, and adapting to workplace changes.

Social Security Ruling 96-8p requires that the ALJ assess the claimant's abilities on a function-by-function basis, including physical, mental, and other limitations. Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). The Eighth Circuit has noted that RFC is a determination based upon all the record evidence. Id.; Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). The RFC is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty to formulate the RFC based on all the relevant, credible evidence of record. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("[t]he Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of his limitations"); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). See also 20 C.F.R. §§ 404.1545(a)(3) and 416.945(a)(3); SSR 96-8p.

Plaintiff argues that the RFC should have included additional limitations related to her nonsevere asthma, fibromyalgia, and carpal tunnel syndrome. Specifically, plaintiff argues that the RFC should have included restrictions on exposure to pulmonary irritants, and limitations on the use of her upper extremities. No such limitations are supported by the

35

evidence of record. In his decision, the ALJ discussed the medical evidence and weight afforded medical opinions regarding plaintiff's claimed symptoms and impairments. He found that medical and other evidence was inconsistent with plaintiff's subjective complaints of disabling pain and other symptoms. The ALJ properly considered the record as a whole in determining the limitations in plaintiff's RFC. The relevant evidence of record fails to support additional limitations related to fibromyalgia, carpal tunnel syndrome, or asthma.

Plaintiff also argues that the ALJ did not adequately account for the effect of obesity in combination with plaintiff's other impairments. In his decision, the ALJ found that plaintiff did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments." None of plaintiff's physicians suggested that obesity caused any functional restrictions. Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions."). Plaintiff does not identify how obesity would further limit her ability to perform a restricted range of medium work. Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) ("Robson claimed that her obesity exacerbated her existing medical infirmities, but she does not explain how including her obesity would change the question to the VE."). Additionally, I note that plaintiff's heaviest weight was recorded in 2006 prior to her alleged onset date and when she was gainfully employed. Although plaintiff testified that she weighed 210 pounds, the medical records indicate she typically weighed from 180 to 195 pounds, with her heaviest weight (199.2 pounds) being recorded prior to her alleged onset date.

Plaintiff also asserts that the ALJ erred by affording weight to the state agency RFC assessment. A state agency disability examiner found that plaintiff was capable of medium

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 36 of 39

exertional work.  As plaintiff points out, the consultant was a "single decisionmaker" who did not qualify as an "acceptable medical source," and, therefore, her assessment was not a medical opinion. See 20 C.F.R. §§ 404.906(b)(2) and 404.1616(b).  However, in formulating plaintiff's residual functional capacity, the ALJ relied primarily on the objective medical evidence, as discussed in his decision.  In support of his RFC finding, the ALJ cited diagnostic testing, treatment notes, and evidence that medication controlled plaintiff's symptoms. Although the record contained no opinion from an examining or consultative medical source regarding plaintiff's physical RFC, there was ample evidence of record to support the limitations found by the ALJ.  "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision."  Anderson v. Shalala, 51 F.3d at 779 (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

Finally, plaintiff argues that the ALJ's inclusion of "mild to moderate" limitations in plaintiff's RFC was vague.  Social Security Regulations define "moderate" functional limitations as less than "marked" but more than "mild."  20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4).  "Mild" impairments minimally limit the claimant's abilities to perform basic work activities.  20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).  Several Eighth Circuit decisions have affirmed similar definitions of "moderate" limitations.  See e.g., Roberson v. Astrue, 481 F.3d 120, 1024-25 (8th Cir. 2007) (affirming ALJ's decision that defined "moderate" as "not prevent[ing] an individual from functioning 'satisfactorily'"); Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (claimant with moderate limitations "would be able to function satisfactorily").  In light of these regulations and case law, the ALJ's use of "mild to moderate" was not vague.

37

In formulating plaintiff's RFC, the ALJ considered plaintiff's alleged symptoms and "the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a) and 416.929(a); SSRs 96-4p, 96-7p. The substantial evidence in the record as a whole supports the ALJ's RFC assessment.

## IX.    FINDING AT STEP FOUR

Plaintiff argues that the ALJ erred in failing to make explicit findings regarding the demands of plaintiff's past work and compare those to the RFC.

After analyzing plaintiff's testimony, the ALJ incorporated into his RFC finding those limitations he found credible. When the vocational expert was asked a hypothetical question with the ALJ's RFC findings, he responded that such a person could perform plaintiff's past relevant work as a sales attendant, filler, and motor assembler. The Eighth Circuit has noted that a job is past relevant work if it was "done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001) (quoting 20 C.F.R. § 404.1565(a)). Plaintiff worked at each of these jobs within the last 15 years, at significant gainful activity levels, and long enough to learn the job.

The hypothetical question to the vocational expert was properly formulated, so the expert's testimony that plaintiff could perform her past relevant work constitutes substantial evidence supporting the Commissioner's decision. Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996); Miller v. Shalala, 8 F.3d 611, 613-614 (8th Cir. 1993).

## X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


　　　　　　　　　　　　　　　　　　　/s/ Robert E. Larsen
　　　　　　　　　　　　　　　　　　ROBERT E. LARSEN
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Kansas City, Missouri
May 1, 2012

Case 6:11-cv-03062-REL   Document 13   Filed 05/02/12   Page 39 of 39